IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 18, 2013

**IN RE AMELIA M.**

**Appeal from the Juvenile Court for Unicoi County**
**No. JV6557      David R. Shults, Judge**

_____

**No. E2012-02022-COA-R3-PT - Filed August 30, 2013**

_____

This is a termination of parental rights case focusing on Amelia M., the minor child ("Child") of James M. ("Father") and Bethany L. ("Mother"). On September 14, 2011, Mother filed a petition to terminate the parental rights of Father, which was subsequently joined by Mother's new husband, William H. ("Stepfather"). Following a bench trial, the trial court granted the petition upon its finding, by clear and convincing evidence, that Father had abandoned the Child by willfully failing to visit her and willfully failing to provide financial support in the four months preceding the filing of the petition. The court further found, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest. Father has appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Matthew A. Spivey, Kingsport, Tennessee, for the appellant, James M.

Stana M. Donnelly, Erwin, Tennessee, for the appellees, Bethany L. and William H.

**OPINION**

I. Factual and Procedural Background

Mother and Father were never married but lived together in Flag Pond, Tennessee, when the Child was born in December 2008. Mother's daughter from a prior relationship, who was then nine years old, also lived with the couple. Father had one son from a previous

relationship for whom he had surrendered his parental rights. Father and Mother separated in November 2009 after an incident at the home that resulted in Father's arrest and Mother's filing for an order of protection. Mother, however, voluntarily dismissed her petition for an order of protection in December 2009.

Regarding residential care of the Child, the trial court entered an agreed permanent parenting plan on December 2, 2009. Mother was designated the primary residential parent, and Father was granted co-parenting time on two consecutive week nights each week and alternating weekends. Father, an Iraq War veteran and master electrician, was unemployed but received monthly veteran's disability payments of $849 for conditions related to post-traumatic stress disorder ("PTSD") stemming from his military service and a broken ankle resulting from a 2009 accident. The permanent parenting plan, *inter alia*, directed that Father would pay $200 in monthly child support until he began working, at which time he was to pay twenty-five percent of his net income.

Father's co-parenting time proceeded as provided in the parenting plan for about one month until he moved to Kentucky in January 2010. The parenting plan made no provisions for either parent to relocate, and neither parent filed for any modifications to the co-parenting residential schedule prior to Mother's filing the petition for termination of parental rights. Between January 2010 and April 2011, Father's visitation was sporadic and occurred in Kentucky, but he did have the Child in his care for at least two extended periods of four to six weeks each. The last time the Child visited Father in Kentucky, she stayed with him at his home from March 27 to May 1, 2011. Prior to that occasion, she had not seen Father since before Christmas 2010.

As Mother prepared to pick up the Child in Kentucky on May 1, 2011, she learned that Father had been arrested for allegedly assaulting his fiancé, Sarah N. The record shows that this assault charge was dismissed by the Kentucky court at Sarah N.'s request. Sarah N. gave birth to a daughter, Father's third child, on August 26, 2011. This new baby, Savannah, was living with Father and Sarah N. at the time of the instant trial, as were Sarah N.'s two minor sons, ages eight and nine, from a previous relationship.

Mother, without benefit of counsel, filed a petition for termination of Father's parental rights on September 14, 2011, alleging that it was not in the Child's best interest to be with Father because of Father's violent behavior and addiction to PTSD medication. She also alleged that Father had failed to support the child and failed to visit the Child as ordered by the trial court. Following a hearing on October 19, 2011, the trial court ordered that the residential schedule established in the parenting plan would remain in effect but that the Child was not to leave Tennessee.

On November 23, 2011, Mother and Stepfather, who was then Mother's fiancé, filed an amended termination petition with the aid of counsel. They alleged grounds of abandonment by Father's willful failure to visit or support for four months preceding the filing of the original petition, a time period beginning on May 14, 2011, two weeks after Mother picked up the Child in Kentucky. Mother and Stepfather expressly stated in the Amended Petition that they both desired to have Stepfather adopt the Child.[1]

Simultaneously with the filing of the amended petition, Father filed an answer to the original petition, accompanied by a motion to dismiss the petition and a motion to increase his co-parenting time. In his motions, Father alleged that Mother refused to allow him visitation with the Child and that Mother had attempted to alienate the Child from Father, constituting a material change in circumstance since the December 2009 parenting order. Father requested an increase in his co-parenting time to fifty percent and designation as the Child's primary residential parent.

Mother subsequently filed an emergency motion to suspend Father's visitation on November 30, 2011. The motion alleged that (1) Father had threatened and verbally harassed Mother since the original petition was filed, (2) reinstating visitation with Father would pose a risk of substantial harm to the Child, and (3) Mother feared Father would flee Tennessee with the Child if allowed unsupervised access. Upon Mother's emergency motion, the trial court ordered that Father exercise visitation with the Child on alternate weekends during Saturday and Sunday from 2:00 p.m. to 4:00 p.m. at the McDonald's restaurant in Erwin, Tennessee. The trial court also appointed attorney William Lawson as the Child's guardian *ad litem* ("GAL").

Mother filed a petition for an order of protection against Father in Unicoi County General Sessions Court in December 2011 after he allegedly threatened her life and Stepfather's life via telephone. The general sessions court entered an *ex parte* order of protection, which was extended by agreement of the parties in January 2012. The court did allow contact between Father and Mother to the extent it was related to exchanging the Child for visitation or if it was incidental to phone calls between Father and the Child.

---

[1]We note that Mother did not have standing to petition for termination of Father's parental rights until Stepfather joined with her in the amended petition. *See Osborn v. Marr*, 127 S.W.3d 737, 738 (Tenn. 2004) (holding that pursuant to Tennessee Code Annotated § 36-1-113(b), a parent does not have standing to petition for termination of the other parent's parental rights and noting: "The termination of a parent's parental rights outside the context of a prospective adoption would deny the child the support of two parents."). The issue of standing was not raised in the trial court and does not affect our analysis because Stepfather has standing under Tennessee Code Annotated § 36-1-113(b) as a prospective adoptive parent, who must then be joined by Mother in his petition to adopt the Child. *See* § T.C.A. § 36-1-115(c).

Following a trial spanning four non-consecutive days from May 23, 2012, to July 25, 2012, the trial court entered a final order on August 17, 2012, finding by clear and convincing evidence that Father had abandoned the Child by willfully failing to visit and willfully failing to support or make reasonable payments toward support of the Child during the four months preceding the filing of the petition for termination. The court further found by clear and convincing evidence that it was in the best interest of the Child for Father's parental rights to be terminated. Father timely appealed.

## II. Issues Presented

On appeal, Father presents three issues, which we have restated as follows:

1.     Whether the trial court erred by finding there was clear and convincing evidence of the statutory ground of abandonment, by willful failure to visit and willful failure to support, for termination of Father's parental rights.

2.     Whether the trial court erred by finding there was clear and convincing evidence that it was in the best interest of the Child to terminate Father's parental rights and allow Mother and Stepfather to proceed with the adoption of the Child.

3.     Whether the trial court erred by not finding a material change in circumstance warranting a modification of the existing permanent parenting plan by an increase of Father's co-parenting time and designation of Father as the Child's primary residential parent.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

IV. Statutory Abandonment

The trial court terminated Father's parental rights on the ground that he abandoned the Child. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2012) provides, as relevant to this action, as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2010) defines abandonment, in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. Further, failure to visit or to support is not excused by another person's conduct "unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.*

This Court further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

This Court has often held that a parent's demeanor and credibility as a witness play "an important role in determining intent, and trial courts are accordingly in the best position to make such determinations." *In re Adoption of Destiny R.D.*, No. M2011-01153-COA-R3-PT, 2012 WL 1066496 (Tenn. Ct. App. Mar. 27, 2012) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)). Further, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made."

### A. Willful Failure to Visit

In its judgment, the trial court specified the following pertinent findings of fact regarding the ground of abandonment by willful failure to visit the Child:

> [A]ccording to ***Tennessee Code Annotated §36-1-113(g)(1), §36-1-102(1)(A) and (i), §36-1-102(1)(E)***, there is clear and convincing evidence that [Father] has willfully abandoned the minor child in that he has willfully failed to visit with the child in the four months preceding the filing of the Petition to Terminate Father's Parental Rights. [Father] exercised no physical visitation with the minor child during those four months. As for non-physical visitation, evidence through phone records showed that of [Father's] 5,296 outgoing phone calls, only twenty-two (22) phone calls were made by [Father] to [Mother's] phone during the four months preceding the filing of the Termination. Only eight (8) of the phone calls were made when the child was available, i.e., not during [Mother's] work hours when the child was in daycare. It is the Court's finding that those few of phone calls, during the four month period, are merely a "token" gesture as defined in ***Tennessee Code Annotated §36-1-102(1)(C)***, meaning "visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."
>
> Furthermore, the Court finds that [Mother and Stepfather] have not prevented [Father] from performing his duty to visit or support the minor child. No actions by [Mother and Stepfather] have amounted to a significant restraint or interference with [Father's] efforts to support or develop a relationship with the minor child.

The trial court found, by clear and convincing evidence, that Father had willfully failed to visit the Child during the applicable four-month period preceding the filing of the petition for termination of parental rights. In so finding, the court specifically noted that Mother and Stepfather had taken no actions significant enough to prevent Father from visiting the Child. We agree.

Prior to Mother's filing of the petition on September 14, 2011, Father had last seen the Child four and one-half months before when Mother picked the Child up in Kentucky on May 1, 2011. It is undisputed that Father did not attempt to visit the Child in Tennessee during this time period. At the trial, Father testified that he attempted to arrange visits with the Child in Kentucky in both July and August 2011 but that Mother made excuses for not sending the Child and tried to place conditions on his co-parenting time. Mother maintained, however, that during the relevant period, she invited Father to visit the Child in Tennessee at any time and for as long he needed to stay, provided that the Child stayed in Tennessee.

According to Father, when he and Mother separated in November 2009, it was a few days after he had been laid off from his job as an electrician for a hospital renovation project. Upon departing Mother's home, he rented an apartment and sometimes took care of the Child for as much as a week at a time while Mother applied for employment with the state. Soon after, he received a call from the electrical union, indicating a position available for him in Virginia. He decided, however, that should he relocate, he would rather move home to Kentucky. Once in Kentucky, as he indicated, he kept the Child for up to six weeks at a time, as there existed an oral agreement with Mother in which they would each keep the Child for approximately five weeks of every ten.

Mother testified that Father followed the co-parenting schedule set out in the permanent parenting plan in November 2009 only until he moved to Kentucky in January 2010. Mother said she took the Child to stay with Father in his home in Bardstown, Kentucky, in April 2011 as she needed to find a new child care provider and as Father had not seen the Child since before Christmas 2010. Mother's best friend, Crystal L., accompanied the two on the trip. Mother explained that when they arrived, Father appeared healthy and although he was very "animated," seemed to be doing well.

Mother felt no concerns for the Child's care in Kentucky until Father's mother disclosed there had been a domestic assault, at which time she began to fear for the Child's safety. Mother also testified that when she picked up the Child from Father on May 1, 2011, she was concerned because the Child smelled like smoke, had scratches on her legs, and presented multiple mosquito bites. Stepfather accompanied Mother on the trip to retrieve the Child. Mother further explained that later in May 2011, Father admitted to her that there had been an altercation with his girlfriend and he had spent the night in jail as a result.

Regarding the four-month period immediately preceding the filing of the termination petition, Father said he was ignorant of the law and felt he had been "played" by Mother. He gave three reasons for not visiting the Child in Tennessee during those months: (1) Savannah, the new baby, was born with medical problems requiring special care and multiple medical appointments; (2) he fell through the roof of an old building during that time period

and broke his foot; and (3) he could not afford travel to Tennessee to see the Child, as each trip cost him approximately $400 in expenses. Father added that Mother kept offering "excuses" for why the Child could not come to Kentucky to visit him. He said these excuses included Mother and her then-boyfriend, Joe R., desiring that the Child accompany them on a trip, Mother not wanting the Child to miss Mother's birthday, and a need for the Child to become familiar with her new babysitter.

As Father explained, his third child, Savannah, was born to him and his fiancé, Sarah N., on August 26, 2011. At birth, Savannah suffered from medical conditions that required extended hospitalization and constant care. Father said he remained with Savannah through all of her medical treatment, except for missing one surgery because of a court hearing regarding the current proceedings. He related that Sarah N. was not employed while pregnant. They incurred expenses because of Savannah's medical condition and necessary trips to Louisville three or four times a month for her treatment. Although Sarah N. and Savannah were covered by insurance provided by the state of Kentucky, Father paid for uncovered medications.

Sarah N. corroborated Father's testimony regarding Savannah's medical condition and added that her pregnancy had been difficult, requiring Father to provide her extra care toward the end of the pregnancy. She also corroborated Father's testimony that he had called Mother in July and August 2011 to request that Mother send the Child to Kentucky. She maintained that Father, Father's two sisters, Father's parents, and she had all attempted to call Mother for two weeks during this period before Mother returned calls.

Mother asserted that her overriding reason for not sending the Child to Kentucky was her fear for the Child's safety. Mother's original petition for termination, under a section inquiring why the affiant believed termination of the parent's rights to the child was in the child's best interest, included the following statement: "After finding out he went to jail for the 2nd domestic charge while she was visiting, I have not let him see her." When questioned during trial about this statement, Mother explained that she meant she was not taking the Child to Kentucky because of safety concerns, not that she would keep Father from seeing the Child at all. She insisted she told Father repeatedly that he was welcome to visit the Child in Tennessee, even for weeks at a time, but the visits "had to be here."

Testimony was undisputed that after Father's visitation was modified by the *ex parte* order of protection to alternate Saturdays and Sundays for two hours each afternoon, Father exercised his co-parenting time only twice, the first weekend in December 2011 and the weekend before the hearing held on June 8, 2012. Mother testified that she, Stepfather, and/or her father had taken the Child to McDonald's for the scheduled visits each alternate weekend but that Father had appeared only for the two weekends. Father, Stepfather, and

-9-

the maternal grandfather, David L. ("Grandfather"), all testified that during the visitation in December 2011, Stepfather and Grandfather sat at an inside table at McDonald's while Father and the Child stayed in the play area. During the June co-parenting time, Father asked Stepfather and Grandfather to remain out of sight. They accordingly waited in a truck in the parking lot while Father visited with the Child. Father testified that although he desired to see his daughter, having to visit with her at McDonald's while being watched was a horrible experience.

At the close of the June 8, 2012 hearing, Father requested a change in the co-parenting venue from the McDonald's in Erwin to another location. The parties agreed and the court ordered that pending a final adjudication in the case, Father's alternate Saturday and Sunday visits from 2:00 p.m. to 4:00 p.m. would occur at the Kiwanis Park in Erwin. During the June 26, 2012 hearing, Father testified that he failed to appear for the intervening visit scheduled at Kiwanis Park because he was very ill. Father texted Stepfather "out of courtesy" but admitted sending the message on Sunday after missing the Saturday visit. When asked if he did not believe he needed to tell Mother and Stepfather if he were going to miss a visit, Father said, "I don't have to tell them anything."

Father contends that the evidence supporting the trial court's finding that he willfully failed to visit the Child falls short of the clear and convincing standard inasmuch as Mother actively prevented him from visiting the Child and because he was unable to afford travel from Kentucky to Tennessee to see the Child during the four months at issue. As the trial court noted in its judgment, Father's relocation to Kentucky was his voluntary decision. The testimony of both parents evinced their oral agreement from approximately January 2010 through April 2011 to permit the Child to visit Father in Kentucky. Father never petitioned the court, however, to modify the November 2009 permanent parenting plan order due to his relocation. He likewise never secured a modification of his residential co-parenting time or visitation location. During the four months preceding the filing of the petition, Father's attempts to visit the Child were limited to his telephone requests in July and August 2011 for the Child to visit in Kentucky.

To support his position, Father relies on three case decisions in which Tennessee appellate courts have concluded that a parent's failure to visit a child was excused by another party's interference with the parent's visitation. First, in *In re Adoption of A.M.H.*, during the four months preceding the filing of a petition for termination of parental rights, the biological parents, who were Chinese citizens, went to the home of their children's foster parents for visitation and, when turned away by the foster parents, refused to leave until told to do so by police. *See* 215 S.W.3d 793, 810-811 (Tenn. 2007). The parents in *A.M.H.* also actively initiated legal proceedings to regain access to their children during the time period in question. *Id.* Second, in *In re S.M.*, a licensed child placement agency did not cooperate

-10-

with the child's putative father to allow visitation in the four months preceding filing of the termination proceeding. *See* 149 S.W.3d 632, 643 (Tenn. Ct. App. 2006). The agency instead told the putative father that his only option was to litigate the matter, which he did. *Id.* Finally, *In re T.C.D.* concerned modification of a parenting plan order where the mother unilaterally decided that the father's visitation should be supervised in contravention of the trial court's order. *See* 261 S.W.3d 734, 747 (Tenn. Ct. App. 2007).

Father's reliance on these cases is misplaced, as each is factually distinguishable from the case at bar. Here, during the four months at issue, Father did not travel to the Child's residence, did not meet with any refusal to let him see the Child in Tennessee as ordered by the November 2009 permanent parenting plan, and did not initiate legal proceedings to petition for a modification of the trial court's order regarding visitation in light of his relocation. *See In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) *(*"A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child.").

According to Mother, she informed Father during the relevant four months that she no longer wanted the Child to travel to Kentucky but that Father was welcome to see the Child in Tennessee. Father acknowledged that in an effort to be courteous, he accepted the reasons Mother gave him for not sending the Child to Kentucky, including that it was Mother's birthday week and that the Child needed to adjust to the care of a new babysitter. Even if Father were unaware that Mother no longer felt the Child was safe with Father in Kentucky, his quick acceptance of Mother's reasons for not sending the Child, together with his failure to travel to Tennessee himself to visit the Child during those four months and his failure to petition the court for a modification, constitute willful failure to visit the Child. *See In the Matter of M.L.P.* at 393 (determining that the child's great aunt's statement to the father on the telephone that a visit was not "a good idea right now" did not constitute a significant restraint or interference with the father's ability to visit the child); *In re D.M.S.* No. M2004-02584-COA-R3-PT, 2005 WL 1887526 at *9-10 (Tenn. Ct. App. Aug. 9, 2005) (determining that where the children's mother initially left the children in Tennessee and traveled to Wisconsin because of a family emergency, her continued absence from the jurisdiction in which her children lived and her decision to relocate to Wisconsin rather than stay where she could more easily visit her children contributed to clear and convincing evidence of her willful failure to visit).

In addition, although Father's financial situation was certainly strained by Savannah's need for specialized medical care, Savannah was not born until August 26, 2011, roughly three weeks before Mother filed the petition for termination of Father's parental rights. Father maintained that his foot injury suffered in the summer of 2011 and Sarah N.'s

pregnancy and unemployment all contributed to his inability to afford the expenses of traveling to Tennessee. However, Father also testified that he made several trips to Louisville with Sarah N. and lodged in a hotel while Savannah was treated by specialists. In addition, he supported Sarah N.'s two minor sons during the summer of 2011. The evidence did not demonstrate that Father was prevented by financial constraints from traveling to Tennessee to visit the Child.

Regarding Father's contact with the Child by telephone, the trial court found that Father's calls to the Child during the four months preceding the filing of the petition represented only a token gesture toward visitation. In making this finding, the court cited Tennessee Code Annotated § 36-1-102(1)(C), which defines token visitation as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." We find no precedent in which Tennessee appellate courts have held that telephone calls may function as visitation for purposes of determining whether a parent has willfully abandoned a child. Telephone calls may be relevant, however, as contact between parent and child. *See, e.g., In re Keri C.*, 384 S.W.3d 731, 747-752 (Tenn. Ct. App. 2010) (analyzing the mother's telephone calls to the child as relevant to whether the mother initiated only token contact with the child, but distinguishing telephone calls from in-person visitation); *but see In re Joshua S.*, No. 2010-01331-COA-R3-PT, 2011 WL 2464720 at *16 n.17 (Tenn. Ct. App. June 16, 2011) ("Particularly in light of [the child's] age, we find that the sporadic short telephone conversations during the determinative time period constituted at most inconsequential 'token' visitation.").

Father's telephonic records for April 1 through December 1, 2011, reflected a total of 10,267 phone calls initiated or received by his telephone for those nine months. During the four months between May 14 and September 14, 2011, Father made twenty-two calls to a telephone number that Mother testified was her only personal telephone during that time period. Mother acknowledged that Father possessed her telephone number at work also and had called there a few times. Father testified that Mother "kept losing telephones" and had multiple numbers during the time frame at issue. Of the twenty-two calls placed by Father to Mother's acknowledged number, Mother explained that fourteen were made when the Child was unavailable, either because she was with a caretaker during Mother's work hours or because it was past her bedtime at night.

Father testified that during the determinative four months, the Child could not actually communicate via telephone because of her young age. He said he inquired as to the Child's welfare often via text message to Mother, adding, "I didn't call, not because I didn't care. I did it out of respect. I did it so, you know, I wasn't trying to inconvenience their life but at the same time I wanted to know how my daughter was doing." Father indicated he

sometimes called Mother at work because she had numerous telephone numbers and might go two weeks without providing him a new number. He admitted that his telephone records showed some calls were placed to Mother at times between midnight and 2:00 a.m. When questioned why he called in the middle of the night, he related he was trying to reach the Child and sometimes called Mother as many as five times in a day without her answering. The evidence does not preponderate against the trial court's findings that Father called the Child when he could expect to reach the Child only eight times over the four months preceding the filing of the termination petition and that these communications represented only token contact.

Father further argues on appeal that the timing of Mother's filing of the petition demonstrated that she calculated the four months she would need to show his lack of visitation, making sure that he did not see the Child during that time. He testified that he did not realize he was being "played" and that he did not know failing to visit or support the Child for four consecutive months could result in termination of his parental rights on the ground of abandonment. This argument is unavailing. As our state Supreme Court has explained:

> We decline to hold that a parent must be aware of the consequences of his failure to visit for such a failure to be willful. The plain language of the statute requires that the failure to visit be "willful," not that the parent be fully apprised of every consequence the failure to visit might produce. Persons are presumed to know the law, *see Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Bd. of Educ. v. Shelby County*, 207 Tenn. 330, 339 S.W.2d 569, 584 (1960), and parents should know that they have a responsibility to visit their children.

*In the Matter of M.L.P.*, 281 S.W.3d at 392. The evidence does not preponderate against the trial court's determination that Father willfully failed to visit the Child for four consecutive months preceding the filing of the petition for termination of his parental rights. The trial court did not err in terminating Father's parental rights based upon this ground.

B. Willful Failure to Support

In its final judgment, the trial court included the following specific findings regarding Father's willful failure to support the Child:

> [A]ccording to ***Tennessee Code Annotated §36-1-113(g)(1), §36-1-102(1)(A) and (i), §36-1-102(1)(B), §36-1-102(1)(D)***, there is clear and convincing evidence that [Father] has willfully failed to support the minor

child and has willfully failed to make reasonable payments toward the support of the minor child for four (4) consecutive months immediately preceding the filing of the Petition to Terminate Parental Rights. [Father] paid absolutely no child support in the four months preceding the filing of the petition. [Father] was aware of his duty to support, as a result of prior Orders of this Court stating his child support obligations. [Father] had the capacity to provide support, either through income from private employment or qualification for government benefits. [Father] testified as to his trade as an electrician and also to his partial disability benefits through the Veterans Administration. [Father] made no attempts to provide support to the minor child. He even admitted under oath to withholding child support because he did not see the child. Finally, [Father] had no justifiable excuse for not providing support to the minor child. [Father] moved from Tennessee to Kentucky, and before, during or after said move, failed to file for request for relief from this Court regarding child support or a change in custody arrangement. Furthermore, he never sent letters, cards, birthday gifts, Christmas gifts, clothes, or food to the child. Nor did he pay for child care or the child's substantive [health] care.

The court found, by clear and convincing evidence, that Father had willfully failed to support the Child during the applicable four-month period preceding the filing of the petition for termination of parental rights. We agree.

The trial court's November 2009 permanent parenting plan order, *inter alia*, directed Father to pay $200 per month in child support until he obtained employment, at which time he was to pay twenty-five percent of his net income each month. Father concedes that he did not make any child support payments or pay for any of the Child's needs during the four months preceding the filing of the petition on September 14, 2011. He contends that his failure to pay such support during those months was not willful because he did not have the ability to pay. *See In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008) ("'A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child.'") (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302 at *8 n.17 (Tenn. Ct. App. Apr. 14, 2005)). Father also argues that his failure to pay support was not willful because he thought he had overpaid child support in the past by authorizing Mother to keep unemployment checks he received at Mother's address.

Father testified that his primary source of income during the applicable four-month period was his veteran's partial disability payment of $849 a month. Father does not dispute that disability payments may be used as a source of income in calculating child support. *See Gragg v. Gragg*, 12 S.W.3d 412, 418-19 (Tenn. 2000). Father also explained that he worked part-time as an electrician when he could and secured other odd jobs. He noted that he still

experienced pain from his 2009 ankle injury and that during the four-month period at issue, he suffered another injury by "falling through a 200-year-old building" and fracturing his shoulder blade. He continued to undergo physical therapy through the Veteran's Administration and completed a "cognitive behavioral approach" to managing pain. He asserted the pain limited his ability to work, making a full forty-hour week on his feet impossible. Father and Sarah N. both testified that because Sarah N.'s sons received only sporadic financial support from their father and because Sarah N. was unemployed during the final months of her pregnancy, Father was supporting Sarah N.'s sons from May through September 2011.

According to Father, he was receiving unemployment checks of $157 a week after being laid off as a union electrician at the time the parents separated. He said the unemployment checks were going to Mother's address, with Mother endorsing and cashing them. He maintained they had reached an oral agreement providing that Mother would keep the unemployment payments and then "go easy" on him for two or three months after he moved into a new house. During the trial, he presented a receipt, with Mother's name signed below, indicating that he had paid $157 weekly to Mother from April 1, 2010, through July 1, 2010, for a total of $2,198. He subsequently testified that his unemployment benefits extended from about November 2009 through November 2010. Mother acknowledged that she may have received Father's entire unemployment check during some months but said their agreement was for those funds to cover repair and maintenance costs of her Jeep, which Father had been using while they lived together.

The record shows that after Mother sought assistance from Child Support Enforcement Services, Father paid $200 a month from September 24, 2010, through November 19, 2010. In 2011, he made the following payments: $100 on January 18, $80 on February 8, and $300 on December 1. On April 27, 2012, Father paid a lump-sum arrearage of $1,100.

The trial court found that Father had the ability to pay child support during the relevant four months because he received income from his disability benefits and part-time work. In explaining why he had difficulty affording trips to Tennessee to visit the Child, Father related that he was spending money supporting his fiance's children and traveling for his own physical therapy and Savannah's medical treatments. Father's testimony did not reveal an extravagant lifestyle by any means, but it is clear that he failed to make paying child support for this Child a priority. Instead, Father allowed over four consecutive months to lapse without supporting her at all. Mother and Stepfather's undisputed testimony was that Mother's work with the state tourism department had covered the Child's medical insurance costs until Stepfather's insurance began to cover the Child when the couple married. Father did not dispute Mother's testimony that he paid for none of the Child's needs during the four

months preceding the filing of the termination petition. Further, he sent no cards, letters, or gifts to the Child during that time.

As the trial court noted, Father admitted that during the summer of 2011, he told Mother: "When you let me see my daughter, you'll get every bit of your money." This admission did not comport with Father's assertion that he thought he had somehow prepaid child support by allowing Mother to keep unemployment benefit checks a full year before the four months in question. Regardless of whether the parties considered any portion of Father's unemployment checks to be child support in 2010, the record is clear that Father did not financially support the child in any way from May 14, 2011, through September 14, 2011.

We conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that Father abandoned the Child by willfully failing to visit her and willfully failing to support her during the four months preceding the filing of the termination petition. The trial court did not err in terminating Father's parental rights based upon this ground.

## V. Best Interest of Child

When a parent has been found to be unfit by establishment of a ground for termination, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2010) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services

agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances[2] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

---

[2]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

In determining that termination of Father's parental rights was in the best interest of the Child, the trial court stated:

> [A]ccording to ***Tennessee Code Annotated §36-1-113(i)***, there is clear and convincing evidence that it is in the best interest of the minor child that [Father's] parental rights be terminated and that [Mother and Stepfather] be allowed to proceed in adopting the minor child. First, [Father] did not maintain regular visitation or other meaningful contact with the child during the four months prior to the filing of the Petition to Terminate Parental Rights. Therefore, the Court finds that no meaningful relationship has been established between [Father] and the child. Secondly, the Court finds that this unavailability has weakened the parent-child relationship, so that there is no emotional attachment from child to father. Third, [Father] asked for, and this Court granted, weekend parenting time with the minor child, however [Father] failed to see the child but eight (8) hours out of a potential fifty-six (56) hours.

The trial court therefore concluded that it was in the Child's best interest to terminate Father's parental rights. Upon our careful review of the entire record, we agree.

In analyzing the factors contained in Tennessee Code Annotated § 36-1-113(i), the trial court emphasized three factors as weighing heavily against maintaining Father's parental rights: (3) lack of regular visitation or other contact, (4) lack of meaningful relationship with the Child, and (9) lack of financial support. Father contends that in finding no meaningful relationship between Father and the Child, the trial court erred by incorrectly shifting the burden of proof of a meaningful relationship to Father. We disagree. Father correctly notes that the parties seeking termination bear the burden of proving that termination of parental rights is in the child's best interest. *See In re Adoption of A.M.H.*, 215 S.W.3d at 808-09. In the portion of the trial court's judgment noted above, the court used "Therefore" to establish a causal relationship between Father's failure to "maintain regular visitation or other meaningful contact with the child" and the court's finding that no meaningful relationship had been established. The court further found that Father's continued unavailability, including his scant use of weekend visitation awarded during the pendency of the termination proceedings, had further weakened the parent-child relationship. To support his contention that the court improperly shifted the burden of proof, Father relies on the second sentence of the following paragraph, which appears later in the trial court's final judgment:

> The Court finds by *clear and convincing evidence* that the best interests of the child is served by granting the termination of parental rights and allowing the Petitioners to adopt the minor child. [Father] has not

demonstrated to this Court that an emotional attachment exists between [Father] and the child. Furthermore, when the Court set parenting time, at [Father's] request, he did not exercise parenting time to the extent to which it was available to him. As such, the Court finds that no meaningful relationship exists between [Father] and the child; and that it is in the best interests of the child to terminate [Father's] parental rights.

At this point in its judgment, the trial court had already summarized the causal relationship between Father's failure to visit and the lack of meaningful relationship, as further emphasized by the third and fourth sentences of the above paragraph.

We determine that the trial court properly held Mother and Stepfather to their burden of proof before ruling that Father was unable to refute that proof. Father testified that he lived in Mother's home with Mother and the Child when the Child was an infant and he was recovering from a severe ankle injury. It was undisputed that the Child visited Father in Kentucky sporadically in 2010 and for five weeks in the spring of 2011. Sarah N. testified that in April 2011, the relationship between Father and the Child was good and that the Child had Father "wrapped around her little finger." Mother testified, however, that when she arrived to pick up the Child from Father on May 1, 2011, Father had been arrested following an altercation at the home. The Child was staying with Father's sister.

Both Mother and Stepfather indicated that the Child was frightened and upset thereafter when Father told her during at least one telephone call that she would be coming to Kentucky to stay with him. Father found the two visits at McDonald's uncomfortable as he had difficulty interacting with the Child when he knew Stepfather and Grandfather were in the building or the parking lot. Mother and Stepfather offered that the Child did not talk about Father or even ask for him. The trial court reached its finding that no meaningful relationship or emotional attachment existed between Father and the Child after assessing the credibility of the witnesses and noting Father's role in allowing the parent-child relationship to deteriorate. We discern no reason to disturb the trial court's finding regarding a lack of meaningful relationship. *See In re D.L.B.*, 118 S.W.3d at 367 (noting that trial courts are in the best position to determine parents' credibility as witnesses).

In its analysis, the trial court indirectly addressed factor (5), the effect a change of caretakers would likely have on the Child's emotional, psychological, and medical condition. *See* T.C.A. § 36-1-113(i)(5). In finding that Father did not have a meaningful relationship with the Child and had taken negligible advantage of the visitation granted to him during the proceedings, the trial court determined that the Child was not emotionally attached to Father. It follows that in such a situation, the potential emotional and psychological effect on the

Child of changing caretakers to Father while he exercised residential parenting time would be detrimental.

Further, our review of the record reveals that the remaining statutory factors do not weigh in favor of maintaining Father's parental rights. *See* Tenn. R. App. P. 13(c) (noting that this Court "may consider those facts established by the evidence in the trial court and set forth in the record. . . ."); *see In re Dominique L.H.*, 393 S.W.3d 710, 716 (Tenn. Ct. App. 2012) ("We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights."); *White*, 171 S.W.3d at 194 (taking notice of the appellate record in affirming trial court's best interest finding). The trial court did not address in its judgment allegations that Father had exhibited a violent temper in the presence of the Child and had struggled with substance abuse.

Mother testified that during the incident giving rise to her November 2009 petition for an order of protection, Father twisted her arm, pinned her against a wall, and spat in her face, all while she held the Child, who was eleven months old at the time. She alleged that Father had thrown objects and kicked an antique pie safe in the presence of the Child and Mother's older daughter, Libby, who was then ten years old. Mother stated Father pinned Libby against a wall while yelling at her. Mother and Stepfather both testified that since the filing of the termination petition, they had heard Father speak negatively about Mother to the Child during his telephone calls, including that it was "mommy's fault" he could not see the Child. Mother alleged that during one incident when she removed the telephone from the Child's grasp because of Father's negative words, the Child overheard Father tell Mother, "I'm going to kill you." Mother related that in similar incidents, Father told her he hoped her unborn son would die and threatened to kill Stepfather.

According to Mother, when she and Father lived together, she observed Father smoke marijuana and "eat pills," specifically Xanax, Lortabs, and Oxycontin. She said that his pills were obtained by prescription but that he used the pills "in a matter of days." Mother recalled that after Father's 2009 accident when he was taking morphine in the hospital, she observed him enlisting a friend to bring additional pain medication. Mother said she reported this to the nurse on duty, who then had the friend removed. Mother also described the day the Child was born. By Mother's account, Father was present and in good condition for the birth. After he left "to get something," he returned a "completely different person," could "barely walk through the door," and fell fast asleep in her hospital bed.

Father denied the allegations of physical violence, asserting that he had never grabbed or threatened a child or hit a woman. Mother did voluntarily dismiss the 2009 order of protection, although she clarified she did so under pressure from Father. Regarding Father's

-20-

May 2011 assault charge, Sarah N. acknowledged that the responding police officer listed her as the victim. She testified, however, that the report was the result of a misunderstanding after she tried to stop an altercation in her driveway between Father and his sister's friend. The Kentucky court's order dismissing the assault charge included an affidavit from Sarah N. in which she stated that Father did not assault her. Father also denied that he had abused drugs, indicating that he had only taken medication prescribed to help him with sleeping disorders caused by PTSD and to control pain from his 2009 and 2011 accident injuries. He maintained that at the time of the trial, he no longer used prescribed narcotics because he had learned to use behavioral coping skills instead. Father acknowledged having a criminal history in Kentucky that included convictions for several counts of theft by deception for overdrawn checks in 2009 and an earlier conviction for receiving stolen property, specifically a firearm Father said he purchased without knowing it was stolen.

Having found that Father had failed to visit, support, or maintain a meaningful relationship with the Child, the trial court in its judgment did not rely on the petitioners' allegations of violence and drug abuse in determining that termination of Father's parental rights was in the best interest of the Child. Although the testimony regarding these allegations was mixed, the record cannot be said to weigh in Father's favor for the following factors: (1) whether Father "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home"; (6) whether Father has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household"; (7) whether the "physical environment" of Father's home is healthy and safe, including whether there is such use of controlled substances "as may render the parent or guardian consistently unable to care for the child in a safe and stable manner"; and (8) whether Father's "mental and/or emotional status would be detrimental to the child" or prevent Father from "effectively providing safe and stable care and supervision for the child." *See* T.C.A. § 36-1-113(i).

Father adds two arguments somewhat outside the statutory factors to support his contention that termination is not in the Child's best interest. *See* T.C.A. § 36-1-113 (i) (stating that when determining the child's best interest, the court is not limited to the factors enumerated in the statute). First, Father argues that Mother's home is unstable for the Child because of Mother's history of previous relationships and the possibility that the Child will have several men as father figures during her childhood. Testimony demonstrated that both parties had struggled with relationship stability. Mother acknowledged that she was married three times before she met Father, was in the process of divorcing her third husband when she met Father, and had recently married Stepfather after giving birth to Stepfather's child. Father testified that he had never been married and that his relationship with Sarah N. was his only serious romantic relationship since separating from Mother. Sarah N., who had given birth to Father's third child, testified that she and Father were engaged but had not set

a date for their wedding. Father acknowledged that he had surrendered parental rights to his oldest child soon after he left the military. Mother testified that by agreement, her older daughter, Libby, had lived with her biological father for about a year at the time of trial because Libby wanted to know her father better, although Mother stressed that she saw Libby "all the time." Mother and Father both expressed certainty that their current relationships would be permanent. No evidence was presented that either Mother or Stepfather were unfit to care for the Child, and Stepfather testified that if Father's rights were terminated, he would like to adopt the Child. Father's argument on this point is unavailing.

Father also argues that the trial court erred by not following the GAL's recommendation to maintain Father's parental rights to the Child. At the close of the trial, the GAL stated that he believed Father's rights should not be terminated despite Father having "had some problems in the past." The GAL provided two reasons for his recommendation: (1) Father's biological relationship to the Child and (2) deprivation of the Child's relationship with her infant half-sister, Savannah. Father's biological relationship to the Child is, of course, why Father has "a fundamental constitutional interest in the care and custody of [his child] under both the United States and Tennessee constitutions." *See Keisling*, 92 S.W.3d at 378. That relationship does not, however, immunize him from termination of his parental rights when "there is clear and convincing evidence justifying such termination under the applicable statute." *See In re Drinnon*, 776 S.W.2d at 97. As for the Child's relationship with Savannah, the GAL described observing the two young girls together during a visit at McDonald's when Savannah was two months old. The GAL believed that terminating Father's rights to the Child would also be terminating Savannah's right to know the Child. No evidence was presented of a bonded relationship between the Child and her half-sister beyond that one meeting. We must conclude that the trial court correctly weighed the statutory factors in favor of terminating Father's parental rights more heavily than the GAL's recommendation to preserve the half-sibling relationship. From a thorough examination of the record before us, we determine that there is clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

### V. Father's Request for Modification of Permanent Parenting Plan

Father contends that the trial court erred by not considering his counterclaim to Mother's petition for termination, in which he averred that a material change in circumstance had occurred since the 2009 permanent parenting plan order, warranting an increase in his residential co-parenting time and his designation as the primary residential parent. Having concluded that the trial court did not err in terminating Father's parental rights, we also conclude that the trial court properly declined to reach Father's request for modification of the permanent parenting plan.

## VI.  Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to the appellant, James M.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE